**UNDER SEAL**

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff | ) | (Under Seal) |
| | ) | |
| | ) | Criminal Case: 1:11-mj-467 |
| v. | ) | |
| | ) | |
| AYMAN JOUMAA, | ) | |
| a/k/a Junior, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALEJANDRO LOPEZ, | ) | |
| a/k/a Angel, | ) | |
| | ) | |
| Defendants | ) | |

## AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT AND CRIMINAL COMPLAINT

I, R. Kevin Schreiber, Special Agent with the United States Drug Enforcement Administration, being duly sworn, depose and state as follows:

### BACKGROUND

1. I am a Special Agent (SA) with the United States Drug Enforcement Administration (DEA), Washington Division Office (WDO). I am an investigative or law enforcement officer of the United States, in that I am empowered by law to conduct investigations of violations of the United States Code. I have been employed by the DEA for approximately 15 years. I received approximately 16 weeks training at the DEA Academy in Quantico, Virginia. I have received extensive training pertaining to narcotics investigations and the investigation of various crimes which arise from drug trafficking.

2. I am familiar with the operations of illegal drug trafficking organizations throughout the United States, Colombia, Mexico, and Central America. I have participated in multiple investigations involving Court-ordered interception of wire and electronic communications. I am familiar with the ways in which narcotic traffickers conduct their business, including domestic and international methods of importing and distributing narcotics, money laundering, the use of cellular telephones and digital paging devices to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. My training and experience as a Special Agent of the DEA, and my conversations with other Special Agents of the DEA, state and local investigators familiar with narcotics trafficking and money laundering matters, form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein.

3. Based on my training and experience, and by consulting with other DEA agents who are familiar with Colombian cocaine trade, I know that Colombia is responsible for 90% of the cocaine that is imported into the United States. The cocaine that leaves Colombia is sent along the Central American corridor to Guatemala, Honduras, and Mexico, for eventual shipment to the United States. I also know that there is no substantial domestic drug market in the Central American countries and Mexico for cocaine, and that the price of cocaine increases at each step in its journey north to the United States.

4. Based on my training and experience, I know that the laundering of drug related proceeds is a critical step in a conspiracy to distribute cocaine for unlawful importation into the United States. The laundering of drug proceeds allows foreign drug traffickers to remain undetected so that they can continue to distribute cocaine and other drugs for importation into the United States. The laundered drug proceeds that are returned to the drug traffickers in Colombia

and other countries allow the drug trafficking conspiracy to continue by funding further drug production and distribution aimed at importing future drug shipments to the United States. Thus, the laundering of money is a necessary and crucial part in a drug trafficking conspiracy.

5. This affidavit is submitted in support of a criminal complaint charging Ayman Joumaa, aka Junior, and Alejandro Lopez, aka Angel, with conspiracy to distribute greater than five kilograms of cocaine for the purpose of unlawful importation into the United States (Title 21 United States Code, Sections 959 and 963).

6. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation as well as the observations of other law enforcement officers involved in this investigation. All observations that were not personally made by your affiant were related to me by the person(s) who made such observations.

7. This affidavit contains information necessary to support a finding of probable cause for the complaint and arrest warrant. This affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## INVESTIGATION

8. Since approximately March 2010, I have been involved in an investigation targeting Lebanon-based money launderer for cocaine traffickers, Ayman Joumaa, aka Junior, and his Colombia based partner, Alejandro Lopez, aka Angel. Through extensive interviews with cooperating defendants and DEA confidential sources as well as undercover operations in Colombia, Denmark, and Germany, this investigation has revealed the following:

### Confidential Source 1

9. Confidential source #1, hereafter referred to as CS1, has pleaded guilty to federal narcotics trafficking offenses in United States District Court and is awaiting sentencing. CS1's

plea acknowledges his/her participation in a conspiracy to import approximately 85,000 kilograms of cocaine into the United States from 2005 to 2007. CS1 advised that he/she participated in a conspiracy to ship multi-thousand kilogram quantities of cocaine from Colombia, to Guatemala, Honduras, and Mexico for sale to the Los Zetas trafficking organization in Mexico. CS1 stated that the ultimate destination for these thousands of kilograms of cocaine was the United States. CS1 is currently cooperating with law enforcement with the anticipation of obtaining a reduction in his/her sentence.

10. CS1 began working with Ayman Joumaa in or about 2004. CS1 stated that Joumaa, also known to CS1 as "Junior", would arrange for the laundering of drug related proceeds from Mexico, Europe (predominantly Spain), and West Africa to Colombia. CS1 advised that he/she would contact Joumaa via email, Blackberry PIN, or telephone in order to arrange for the delivery of drug related proceeds to members of Joumaa's organization. Joumaa and members his organization would then launder these proceeds and return them in Colombia. CS1 stated that Joumaa would charge a fee of approximately 13% for the laundering of these proceeds. CS1 advised that the proceeds received by Joumaa and members of his organization were in the form of United States currency. This United States currency was proceeds from the sale of cocaine in the United States.

11. CS1 stated that he/she would arrange for the delivery of bulk United States currency to Joumaa and members of his organization. These deliveries from the sale of cocaine that was shipped to the United States were made in Mexico City, Mexico. CS1 advised that once the drug proceeds were delivered to members of the Joumaa organization, the laundered proceeds would be paid to CS1 or his/her representatives in Venezuela or Colombia. Payment in Venezuela was in the form of Bolivars. Payment in Colombia was in the form of Colombian

pesos. CS1 advised that Joumaa would pay CS1 and CS1's representatives within one to five days from the date of delivery of the United States currency in Mexico. CS1 advised that Joumaa typically picked up between 2 to 4 million dollars at a time from CS1 in Mexico City. CS1 stated that Joumaa continued to launder drug related proceeds for CS1 until 2008.

### Confidential Source 2

12.  Confidential Source #2, hereafter referred to as CS2, is currently cooperating with law enforcement, including agents from United States Immigration and Customs Enforcement. CS2 was a member of the drug trafficking and money laundering organization and worked extensively with CS1. CS2 stated that he/she began working with Ayman Joumaa in or about 2004. CS2 advised that he/she also knew Joumaa by his alias Junior. CS2 advised that he/she, at the direction of CS1, would contact Joumaa via Blackberry, email, or telephone, and arrange for Joumaa and members of his organization, to pick up drug related proceeds in Mexico, Europe, and West Africa. CS2 stated that he/she would coordinate with Joumaa to arrange the pick up of United States currency in Mexico City, Mexico. Joumaa would then launder these proceeds and repay them in Colombia and Venezuela. CS2 advised that the United States currency laundered by Joumaa was the proceeds of the sale of cocaine shipped from Colombia to Guatemala, Honduras, and Mexico, for sale to the Los Zetas trafficking organization in Mexico. CS2 advised that the ultimate destination of the cocaine shipped to Los Zetas was the United States.

13.  CS2 stated that Joumaa would charge a fee of approximately 13% to launder the drug related proceeds from Mexico to Venezuela and Colombia. Payment in Venezuela was in the form of Bolivars. Payment in Colombia was in the form of Colombian pesos. CS2 stated

that he/she continued to utilize the laundering services of Joumaa until approximately 2008. CS2 stated that he/she, at the direction of Immigration and Customs Enforcement agents, continued contact with Joumaa until approximately October 2010.

### Confidential Source 3

14. Confidential Source #3, hereafter referred to as CS3 is currently cooperating with law enforcement with the anticipation of obtaining a reduction in his/her sentence from a pending guilty plea in United States District Court. CS3 has acknowledged his/her participation in a conspiracy to launder drug related proceeds from the United States, Mexico, Central America, and Europe from approximately 1997 through September 2010. CS3 has acknowledged that he/she laundered in excess of $250 million dollars during the course of this conspiracy.

15. CS3 stated that in or about 2007 or 2008 he/she was introduced to Alejandro Lopez, aka Angel. CS3 stated that at the time CS3 met Lopez, Lopez was already involved with the laundering of drug related proceeds from Mexico, Central America, and Europe to Colombia. CS3 stated that Lopez's partner was an individual known to CS3 as a Lebanese individual that went by the nickname "Junior." CS3 advised that Lopez introduced CS3 to Joumaa as Lopez's money laundering business partner.

16. CS3 stated that he/she and Lopez would coordinate their money laundering activities and provide money laundering services to each other. CS3 advised that he/she would contact Lopez to assist CS3 with the laundering of drug related proceeds from Europe to Colombia. CS3 stated that Lopez and CS3 would assist each other with the laundering of drug related proceeds from Mexico, Guatemala, and Honduras to Colombia and Panama.

17. CS3 stated that from approximately 2008 to September 2010 he/she laundered approximately 20 to 25 million dollars of drug related proceeds with the assistance of Lopez.

CS3 advised that the laundered proceeds derived from the shipment of cocaine to Honduras, Guatemala, and Mexico from Colombia. The ultimate destination of this cocaine was the United States. CS3 stated that he/she would arrange with Lopez for the pick-up of drug related proceeds in the above mentioned locations. CS3 advised that he/she would contact Lopez via email, Blackberry, telephone, and in person, to make arrangements for these operations. CS3 stated that Lopez would charge a fee of approximately 14% for the laundering of the drug related proceeds.

18.  CS3 provided agents with a detailed ledger of his/her money laundering activities with Lopez from July 7, 2010 until September 7, 2010. These ledgers reveal that during this time period Lopez and CS3 laundered approximately 4 million dollars in drug related proceeds from Guatemala, Honduras, and Mexico to Colombia.

## CONCLUSION

19.  Based on the aforementioned facts, your affiant believes probable cause exists for a criminal complaint charging Ayman Joumaa, aka Junior, and Alejandro Lopez, aka Angel, with conspiracy to distribute five kilograms or more of cocaine for the purpose of unlawful importation to the United States.

R. Kevin Schreiber
Special Agent
Drug Enforcement Administration
Washington Field Office

Subscribed and sworn to before me this 17 day of June 2011.

/s/
John F. Anderson
United States Magistrate Judge